FILED IN CHAMBERS
U.S.D.C. Rome

MAR 16 2007

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

JESSE WELDON,

        Plaintiff,

v.

BARTOW COUNTY BOARD OF
EDUCATION, et al.,

        Defendants.

CIVIL ACTION

NO. 4:06-CV-29-RLV

O R D E R

This is an action pursuant to 28 U.S.C. § 1983, in which the plaintiff alleged that his civil rights were violated in several ways; he also asserted state law claims for malicious prosecution, false arrest, false imprisonment, and intentional infliction of emotional distress. By order dated October 3, 2006, this court dismissed all claims except the plaintiff's Fourth Amendment claims against Officer Don Thurman in his individual capacity.[1] Officer Thurman has now moved for summary judgment on the plaintiff's Fourth Amendment claim [Doc. No. 76]. Also pending before the court is Officer Thurman's Motion to Quash Plaintiff's Document Subpoena to Bartow County Schools and for Protective Order [Doc. No. 87].

---

[1] In his motion to dismiss, Officer Thurman did not seek dismissal of the plaintiff's Fourth Amendment claim against him, recognizing that the allegations of the complaint, when deemed true for purposes of such a motion, were sufficient to survive a motion to dismiss for failure to state a claim.

I. FACTUAL BACKGROUND

On February 9, 2004, the Bartow County Board of Education held a public meeting, and the plaintiff filled out a Bartow County Board of Education Public Participation form, indicating that he wished to speak at the meeting about corruption in the school system. After filling out the form, the plaintiff was approved to speak, and he did speak for about a minute.[2] Mr. Weldon began his presentation by saying, "This school system is corrupt up to here [indicating his neck." A tape recording of Mr. Weldon's presentation indicates that he continued his statement by saying that Diane Coker, Boyd Pettit, and Randy Reece had gone "to Kentucky and stayed overnight in a motel" when they went there to investigate Mr. Craig Bangston as a potential employee of the school system. The rest of Mr. Weldon's statement was tape-recorded as follows:

> MR. WELDON: Checking out Mr. Bangston you spent $3,000. She comes back here and they hire Mr. Bangston. And that's all well and good. Mr. Bangston was working for $79,000 up there in Kentucky. She brings him down here and gives him $135,000, a $60,000-a-year raise. And that's misusing your title there, Diane. And I have some other things, but I ain't got time to do that.
>
> Tammy Livingood, Paul Battles--all of you should know Paul, but his wife, Mrs. Battle, is a teacher--is an

---

[2] The school board allots 15 minutes for public comment; therefore, the amount of time that a person has to speak depends upon the number of persons who sign up to speak. On February 9, 15 persons had signed up. Therefore, each person was allotted one minute to speak. Other persons are not permitted to interrupt the speakers during their presentations.

2

assistant principal down at Woodland. And Woodland School--she went to work there in '01, worked about a month, month and a half, made $6,000 in '01. In '02 she made--the first of the year they gave her a $35,000 raise, made her assistant principal. Three months later they give her another $40,000 raise and made her assistant principal again. I mean, it's all in there together. She's making $70,000. They are good friends with Ms. Tammy Livingood. Mr. Paul Battles gave $250 on her campaign fund.

Mr. Boyd Pettit over there, he's in a conflict of interest. He paid--he gave $100 on Tammy Livingood's campaign fund. He didn't give none on these people, just Tammy--Mr. Battles.

UNIDENTIFIED FEMALE: But I have had lots of people contribute something and –

MR. WELDON: I've got it. I know who--I got the list, ma'am; okay. You wasn't supposed to say nothing according to the rules here. I'm talking. I have only got a minute. Okay? There's other things I am going to bring against you, two, but just ain't got time. You and Boyd, both.

But the system is corrupt. It was corrupt when Diane came in here and paid $1,000 to keep Phillips' dog. Diane is the one that hired Phillips. They were fixing to kick him out down there down at the other school.

And I am going to tell you something. My time is probably about up, a minute. But if you don't get Mr. Grizzle here, get him on that--Diane's job over there as the board chairman, this school is going to continue to go down.

Reed, I hope you help him. I would love to have a vote tonight, but we ain't got Mr.--he ain't here. But it's going to take you three men because they are friends with Boyd Pettit.

Lamar Grizzle has got the guts to stand up to people and not give it all to--all of you-all up there and smile, but you-all had it made.

UNIDENTIFIED PERSON: I'm sorry, Mr. Weldon.

3

> MR. WELDON: Is that it? I'll get some time next week. I want to get on Gary Burkhalter. He come over here and never been in the school system.

Mr. Weldon then returned to his seat, and the remaining 14 individuals made their statements to the board. Mr. Weldon remained in the room during the rest of the meeting and then left, without incident.

During the meeting, Officer Thurman, employed by the Board of Education as a police officer, and Thad Kinney, Chief of the Board of Education's police department, stood at the back of the meeting room but took no action during or immediately after the meeting. However, Chief Kinney called Officer Thurman the next day and said he thought that Mr. Weldon's comments the night before violated Georgia's criminal defamation statute and gave Officer Thurman the citation for the statute.

Subsequently, Chief Kinney, Coker, Coker's husband met with the state magistrate to discuss the matter. Subsequently, Chief Kinney asked Officer Thurman to meet at Magistrate Moseley's office on February 11. Chief Kinney had five affidavits prepared, alleging criminal defamation against Mr. Weldon. Officer Thurman read the affidavits and agreed with them. After being sworn by Magistrate Moseley, Officer Thurman signed the affidavits, and Magistrate Moseley issued the warrants. Officer Thurman never

4

spoke with any of the board members between the time of the school board meeting and the time he signed the affidavits.

Mr. Weldon was arrested at his home on the night of February 11, around 7:30, and spent the night in jail, since the timing of the arrest made it impossible for him to make bond that evening.

A preliminary hearing was held on September 1, 2004. Mr. Weldon's attorney argued that the criminal defamation statute, O.C.G.A. § 16-11-40, had been declared unconstitutional over 22 years earlier. Magistrate Moseley took the matter under advisement, and on October 20, 2004, he dismissed two of the charges. The other three charges were bound over as disorderly conduct. Almost a year later, in August 2005, the district attorney presented a charge of disruption of lawful meeting, O.C.G.A. § 16-11-34, to the grand jury. However, the grand jury no-billed the charge. This suit then followed.

## II. LEGAL DISCUSSION

Officer Thurman has moved for summary judgment on the basis that he is entitled to qualified immunity. Qualified immunity was also the basis for the motion to dismiss filed by the other defendants, and the court now simply restates its prior discussion of qualified immunity.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct

'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).[3] "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

The United States Supreme Court has set forth a two part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002); see also Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. However, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether

---

[3] In the instant case, the parties do not dispute that Officer Thurman was acting within the course and scope of his discretionary authority with respect to the actions he took.

6

the right was clearly established." *Vinyard*, 311 F.3d at 1346 quoting *Saucier*, 533 U.S. at 201. Thus, the court must first analyze whether Officer Thurman's conduct, taken in the light most favorable to the plaintiff, violated his constitutional rights.

In order to arrest, an officer must demonstrate probable cause for the arrest. If there is probable cause, there is no constitutional violation, and the inquiry is at an end, since the facts would show that there is no cause of action for violation of section 1983.

However, if the court determines that the officer has not shown probable cause, the inquiry then becomes whether the officer has shown arguable probable cause. Lacking probable cause, an officer is still entitled to qualified immunity from a section 1983 claim if the officer had "arguable probable cause." Jones v. Cannon, 174 F.3d 1271 (11th Cir. 1999). "Because only arguable probable cause is needed, the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). Since, as discussed below, the court concludes that Officer Thurman lacked arguable probable cause in seeking the arrest warrants, the court necessarily concludes that he has not shown actual probable cause. Thus, the court concludes that Mr. Weldon has stated a claim for a constitutional violation,

and the court now proceeds to determine if Officer Thurman is entitled to qualified immunity.

The court notes that Mr. Weldon's arrest was not a warrantless arrest but that it was made pursuant to a warrant issued by a magistrate. Ordinarily, a magistrate's decision that probable cause exists is conclusive. "[I]f a magistrate, using his own judgment based on the entire picture presented to him and utilizing his common sense finds probable cause, his determination is conclusive in the absence of arbitrariness." United States v. Long, 674 F.2d 848, 852 (11th Cir. 1982) (internal quotations omitted). However, the Supreme Court has specifically held that an officer is not entitled to qualified immunity if "a reasonably well-trained officer would have known that the search, was illegal despite the magistrate's authorization." United States v. Leon, 568 U.S. 897, 922, n.23, 104 S.Ct. 3405, 3420, n. 23 (1984). In applying that test to an arrest, the Supreme Court stated:

> The analogous question in this case is whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest. It is true that in an ideal legal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system. . . . We find it reasonable to require the officer applying for a warrant to minimize this danger by exercising reasonable professional judgment.

Malley v. Briggs, 475 U.S. 335, 345-46, 106 S.Ct. 1092, 1098 (1986).

In his first affidavit, Officer Thurman stated that between 6:00 p.m. and 7:00 p.m. on February 9, 2004, "Jesse Weldon made derogatory and slanderous statements about Craig Bangston during a public meeting of the Bartow County Board of Education, thereby exposing him to hatred, contempt, ridicule, and causing a breach of the peace."

In his second affidavit, Officer Thurman stated that between 6:00 p.m. and 7:00 p.m. on February 9, 2004, "Jesse Weldon made derogatory and slanderous statements about Dian [sic] Coker during a public meeting of the Bartow County Board of Education, thereby exposing her to hatred, contempt, ridicule, and causing a breach of the peace."

In his third affidavit, Officer Thurman stated that between 6:00 p.m. and 7:00 p.m. on February 9, 2004, "Jesse Weldon authored written communications about Randy Reece thereby exposing him to hatred, contempt, ridicule, and causing a breach of the peace."

In his fourth affidavit, Officer Thurman stated that between 6:00 p.m. and 7:00 p.m. on February 9, 2004, "Jesse Weldon made derogatory and slanderous statements about Tammy Livingood during a public meeting and in written communication on 02/05/04, thereby exposing her to hatred, contempt, ridicule, and causing a breach of the peace."

9

In his fifth affidavit, Officer Thurman stated that between 6:00 p.m. and 7:00 p.m. on February 9, 2004, "Jesse Weldon authored written communication and made derogatory and slanderous statements about Gary Burkhalter, thereby exposing him to hatred, contempt, ridicule, and causing a breach of the peace."

In his deposition, Officer Thurman admitted that Mr. Weldon did not, in fact, cause any breach of the peace at the school board meeting.

> Q   So where did the idea first start, that perhaps – or that you-all believed a crime had been committed?  Because you didn't have a problem with anything that night.
>
> A   I had a problem with some of the stuff he said.  He made no threatening actions.
>
> Q   Right.
>
> A   And –
>
> Q   And he didn't breach the peace.
>
> A   -- Thad was the one –
>
> Q   Right?
>
> A   No, he didn't breach the peace at the time.
>
> . . . .
>
> Q   Now, we clearly went over earlier that you agree that Mr. Weldon did not breach the peace.
>
> A   He did not –
>
>     MR. FREEMAN:  Objection as to the form of the question.
>
> A   He did not breach the peace in my presence, no.

Q     Okay. He didn't breach the peace on February the 9th of 2004?

MR. FREEMAN: Objection as to the form of the question.

A     Who? Are you talking about Weldon again?

Q     Yes, sir.

MR. FREEMAN: Same objection.

A     No, he didn't cause no disturbance or anything like that, if that's what you're getting at.

Deposition of Don Thurman at pp. 88, 114.

Indeed, Officer Thurman testified that he used the words "breach of the peace" because that was "[s]omething you have to put in the affidavit . . . [t]o go along with the charge we used." Deposition of Don Thurman at p. 115.

Officer Thurman also conceded in his deposition that, despite what was sworn to in his affidavit, Mr. Weldon did not make any written communications on the night of the board meeting. Instead, Officer Thurman was referring to the fact that Mr. Weldon "had been writing letters and saying that he [Randy Reece] was - you know, that everybody was corrupt, and he had asked for information, Freedom [of Information Act] information." Deposition of Don Thurman at p. 107. Additionally, with respect to the fifth affidavit, wherein he accused Mr. Weldon of authoring written communications about Gary Burkhalter, Officer Thurman admitted that

11

that statement in his affidavit was "inaccurate." Deposition of Don Thurman at p. 110.

With this factual background in mind, the court turns directly to the question of whether Officer Thurman is entitled to qualified immunity for his actions in seeking arrest warrants for Mr. Weldon. The court easily concludes that the law was clearly established at the time of Officer Thurman's actions that a person could not be arrested for violating Georgia's criminal defamation statute, O.C.G.A. § 16-11-40, since that statute had been declared unconstitutional 22 years earlier by the Georgia Supreme Court.[4] Williamson v. State, 249 Ga. 851 (1982). See Grayden v. Rhodes, 345 F.3d 1225 (11th Cir. 2003) (law can be "clearly established" for qualified immunity purposes by decisions of U.S. Supreme Court, Eleventh Circuit Court of Appeals, or highest court of state where case arose).

Officer Thurman seeks to overcome this hurdle by relying on Devenpeck v. Alford, 543 U.S. 146, 125 S.Ct. 588 (2004), in which

---

[4] Officer Thurman argues that he should be held liable for his mistaken belief that the statute was valid, since he looked in a copy of the Georgia Code and there was nothing to indicate that the statute had been held to be unconstitutional. Even if the court assumes that the copy of the Code used by Officer Thurman did not contain the annotation showing the ruling by the Georgia Supreme Court, the court will still conclude that the law was "clearly established" for purposes of section 1983 liability. The test is not whether an officer has actual knowledge of clearly established law but whether such law has been clearly established by virtue of a binding court decision, which is thereby imputed to the general public, including law enforcement officers.

the Supreme Court stated that an officer's subjective reasoning in effecting a warrantless arrest (or, by extension, seeking an arrest warrant) is irrelevant as long as there are facts that would support an arrest for some charge. Officer Thurman argues that even if Georgia's criminal defamation statute did not provide arguable probable cause for seeking an arrest warrant, Georgia's disorderly conduct statute, O.C.G.A. § 16-11-39, and Georgia's disruption of public meeting statute, O.C.G.A. § 16-11-34, do provide a proper basis. O.C.G.A. § 16-11-39 provides in relevant part:

> A person commits the offense of disorderly conduct when such person . . . [w]ithout provocation, uses to or of another person in such other person's presence, opprobrious or abusive words which by their very utterance tend to incite to an immediate breach of the peace, that is to say, words which as a matter of common knowledge and under ordinary circumstances will, when used to or of another person in such other person's presence, naturally tend to invoke violent resentment, that is, words commonly called "fighting words."

O.C.G.A. § 16-11-34(a) provides:

> A person who recklessly or knowingly commits any act which may reasonably be expected to prevent or disrupt a lawful meeting, gathering, or procession is guilty of a misdemeanor.

After reviewing Mr. Weldon's presentation, the court concludes that arguable probable cause did not exist for arresting Mr. Weldon under these code sections.

Officer Thurman contends that Mr. Weldon accused certain school board officials of having an affair. However, Mr. Weldon

13

simply stated that they had traveled to Kentucky, spent an inordinate amount on the trip and "spent overnight in a motel." He never said that they shared a room. In the context of Mr. Weldon's comments about overspending and corruption, there is little to imply that the board officials and the interviewee were having an affair. Moreover, Mr. Weldon referred to the system as being corrupt, not the individual board members. Additionally, this court concludes that allegations that a board member has been unduly influenced by contributions (when the board member concedes that contributions were made) are protected by the First Amendment. Specifically, this court holds that words used by Mr. Weldon could not reasonably have been interpreted as "fighting words." This conclusion is buttressed by the fact that Officer Thurman concedes that there was no breach of the peace at the board meeting and that he used these words simply because he had to make his affidavit fit the language of the statute.

Moreover, there is nothing in the record to support a finding that Mr. Weldon in any way "prevent[ed] or disrupt[ed]" the school board meeting. Officer Thurman testified that the remaining 14 individuals who had signed up to speak were allowed to speak and that the meeting continued without incident after these persons had spoken. Mr. Weldon did nothing to disrupt this meeting other than act as a gadfly, and simply acting as a gadfly is not a violation

of O.C.G.A. § 16-11-34, nor would a reasonably well-trained officer think that it was.

Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092 (1986), and the fact that a magistrate issued the arrest warrants do not insulate Officer Thurman from liability.  Presumably, the magistrate based his decision to issue the warrants based on the facts alleged in Officer Thurman's affidavits.[5]  However, the affidavits simply used language from the criminal defamation statute and did not quote or suggest what the defamatory language might be.  Additionally, Officer Thurman has conceded that some information in his affidavits was "inaccurate."  Like the court in *Malley*, this court assumes that if he had been told the actual words used by Mr. Weldon and the context of the meeting, the magistrate would not have issued the warrants.

For all the foregoing reasons, the court concludes that Officer Thurman is not entitled to summary judgment with respect to Mr. Weldon's First Amendment claims.  Consequently, his motion for summary judgment is DENIED.

Officer Thurman has also moved to quash a subpoena issued by Mr. Weldon to the Bartow County Schools, Dr. Abbe L. Boring, Superintendent.  Since it does not appear that Officer Thurman has standing to object to the subpoena, the motion is DENIED.  However,

---

[5] It does not appear that the magistrate was given a copy of the recording of Mr. Weldon's presentation.

the court will sua sponte modify the subpoena by striking the first demand. Requesting "[a]ny and all records pertaining to JESSE WELDON" is simply too broad. However, the court concludes that Mr. Weldon, absent an objection by the school system, is entitled to have notes or transcripts of meetings of the Bartow County School System attended by Mr. Weldon (but only after Mr. Weldon provides the specific dates of those meetings); furthermore, the court will restrict this request to meetings that occurred in the 12 months preceding the February 9, 2004, meeting that forms the basis for this litigation. The other three requests, pertaining to video tapes, requests or documents submitted by Mr. Weldon pertaining to his attendance at meetings (but not those made "in anticipation of" his attendance), and any notes or documents generated by employees or members of the school system, are also limited to the 12 month period immediately preceding February 9, 2004.

In summary, Officer Thurman's motion for summary judgment [Doc. No. 76] is DENIED; Officer Thurman's motion to quash [Doc. No. 87] is also DENIED, although the court has sua sponte restricted the scope of the subpoena which was the subject of that motion.

SO ORDERED, this 16th day of March, 2007.

ROBERT L. VINING, JR.
Senior United States District Judge

16